161 P.3d 608

**STATE of Arizona, Appellee,**

v.

**Ricky Kurt WASSENAAR, Appellant.**

**Nos. 1 CA–CR 05–0765, 1 CA–CR 05–0975.**

Court of Appeals of Arizona,
Division 1, Department D.

July 17, 2007.

---

6. The Honorable JEFFERSON L. LANKFORD, *Retired, is authorized to participate in this appeal by the Chief Justice of the Arizona Supreme* Court pursuant to Ariz. Const. art. 6, § 3 and *Administrative Order No. 2007–17.*

Terry Goddard, Attorney General, By Randall M. Howe, Chief Counsel, Criminal Appeals Section, and Joseph L. Parkhurst, Assistant Attorney General, Phoenix, Attorneys for Appellee.

James J. Haas, Maricopa County Public Defender, By James L. Edgar, Deputy Public Defender, Stephen R. Collins, Deputy Public Defender, Phoenix, Attorneys for Appellant.

## OPINION

JOHNSEN, Judge.

¶ 1 Ricky Kurt Wassenaar ("Defendant") appeals his convictions on ten counts of dangerous or deadly assault by a prisoner, five counts of kidnapping and one count each of promoting prison contraband, first-degree escape, sexual assault and aggravated assault. We address the following issues:

    1.   Whether the trial court erred when it designated the case as complex pursuant

to Rule 8.2(a)(3)(iii) of the Arizona Rules of Criminal Procedure;

2. Whether Defendant's right to a speedy trial was denied;

3. Whether Defendant's waiver of counsel was knowing and intelligent;

4. Whether Defendant's right to self-representation was violated when he was required to testify through questions posed by his advisory counsel;

5. Whether the trial court erred when it precluded evidence that Defendant had not previously assaulted a corrections officer;

6. Whether the trial court erred when it precluded evidence regarding why, following his apprehension, Defendant attempted to smuggle a handcuff key into a federal prison facility;

7. Whether the trial court erred when it ordered that Defendant be surreptitiously secured to the witness chair during his testimony; and

8. Whether the trial court erred when it failed to hold an evidentiary hearing regarding whether any jurors saw the restraints that secured Defendant to the witness chair.

For the reasons that follow, we affirm Defendant's convictions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶2 "We construe the evidence in the light most favorable to sustaining the verdict, and resolve all reasonable inferences against the defendant." *State v. Greene*, 192 Ariz. 431, 436, ¶ 12, 967 P.2d 106, 111 (1998). In our review of the record, we resolve any conflict in the evidence in favor of sustaining the verdict. *State v. Guerra*, 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989).

¶3 The charges against Defendant arose from a 15–day prison standoff at the Lewis Complex of the Arizona Department of Corrections ("DOC"), where Defendant was serving a 28–year sentence. He and an accomplice, Steven Coy, attempted to escape in the early morning hours of January 18, 2004. Using homemade knives called "shanks," Defendant and Coy subdued a corrections officer and a civilian employee working in a

kitchen area. Defendant then shaved his beard and mustache and donned the officer's uniform. Defendant next made his way to a guard tower and "buzzed" the personnel inside for permission to enter. Because Defendant appeared on the tower security monitor to be a corrections officer, personnel in the tower opened a gate and tower door remotely and allowed him inside. When Defendant encountered the first officer in the tower, he struck him in the face with a metal kitchen paddle and incapacitated him. Moments later, when Defendant encountered a second officer, he struck her in the face with his knee and subdued her. Defendant handcuffed both officers and gained control of the tower, with the two handcuffed corrections officers both inside.

¶4 As Coy made his way from the kitchen to the tower, he encountered a guard in the dining hall and slashed his face with a shank. Once Coy exited the dining hall and approached the tower, other DOC personnel attempted to stop him. As they did so, Defendant shot at them with a rifle he had obtained from inside the tower. As DOC personnel scattered from the immediate area, Coy was able to enter the tower.

¶5 Because the entire complex had by that time been alerted to the violence, Defendant and Coy could go no further than the tower, and the standoff began. Among other acts against the two hostages in the tower during the standoff, Defendant and Coy sexually assaulted the female officer. Six days after the standoff began, they released the male officer, but the female officer was not released until Defendant and Coy surrendered on February 1, 2004.

¶6 Defendant was indicted on 27 counts in two separate indictments, of which 20 counts ultimately were submitted to the jury. Defendant represented himself at trial with the assistance of advisory counsel. Trial began March 9, 2005 and ended on May 4, 2005.

¶7 Defendant was found guilty of 19 counts as related above but was acquitted of one count of attempted second-degree murder. He does not contest the sufficiency of the evidence to support his convictions. Defendant was ultimately sentenced to 16 con-

secutive life sentences for each count of assault by a prisoner, kidnapping and sexual assault. He also was sentenced to terms of 15.75, 12 and 10 years' imprisonment for promoting prison contraband, first-degree escape and aggravated assault, respectively.

## II. SPEEDY TRIAL RIGHTS

### A. Designation of Case as "Complex."

■ ¶ 8 Under Arizona law, a defendant in custody generally must be tried within 150 days of arraignment. Ariz. R.Crim. P. 8.2(a)(1). However, Rule 8.2(a)(3)(iii) provides that if a case in which the indictment was filed between December 1, 2002 and December 1, 2005 is designated as "complex," it shall be tried within one year from arraignment. Defendant's indictments were filed in 2004. He argues that his case was not complex and that, as a result, he should have been tried within 150 days of arraignment pursuant to Rule 8.2(a)(1). He argues that because his trial was not begun within 150 days of arraignment, the charges against him should have been dismissed.

■ ¶ 9 We review for abuse of discretion a trial court's determination of whether a case is complex for purposes of Rule 8. *See Snyder v. Donato*, 211 Ariz. 117, 119, ¶ 7, 118 P.3d 632, 634 (App.2005). A case is "complex" if it is "so complicated, by virtue of its nature or because of the evidence required, that the ordinary limits for the time to trial are insufficient and must be extended to afford more time to prepare so that the case can be fairly and fully presented." *Id.* at 120, ¶ 12, 118 P.3d at 635. The trial court found Defendant's case was complex because of the unique circumstances of the case, the number of trial witnesses and exhibits, the presence of scientific evidence, the nature and extent of the necessary discovery and the time to comply with discovery obligations.

¶ 10 We find no abuse of discretion. The circumstances of this case made it unique. Hundreds of people were involved in the 15–day prison standoff out of which the charges against Defendant arose. The case took nearly two months to try. It required a large amount of discovery, all of which had to be disclosed to an incarcerated defendant representing himself *in propria persona*. Of the witnesses identified in discovery, nearly 60 testified at trial. More than 500 pieces of evidence were identified and disclosed, and approximately 370 of those items were introduced in evidence. Much of the evidence consisted of medical and/or scientific evidence, including DNA evidence, and included testimony from medical providers and forensics personnel. As we found in *Snyder*, the distinct nature of this case and the discovery and evidentiary logistics involved were not mere "run-of-the-mill discovery and evidentiary problems" that would preclude a complex designation. *Id.* at 122, ¶ 20, 118 P.3d at 637. This case, "by virtue of its nature or because of the evidence required," could properly be designated as complex. *Id.* at 120, ¶ 12, 118 P.3d at 635.

■ ¶ 11 Abuse of discretion is "an exercise of discretion which is manifestly unreasonable, exercised on untenable grounds or for untenable reasons." *State v. Woody*, 173 Ariz. 561, 563, 845 P.2d 487, 489 (App.1992) (quoting *Williams v. Williams*, 166 Ariz. 260, 265, 801 P.2d 495, 500 (App.1990)). We find the trial court did not abuse its discretion when it designated the case as complex pursuant to Rule 8.2(a)(3)(iii).

### B. Trial Continuance.

¶ 12 Defendant next argues that he was denied his right to a speedy trial pursuant to Rule 8 of the Arizona Rules of Criminal Procedure, the Sixth Amendment and the Arizona Constitution.

¶ 13 The charges against Defendant were presented in two separate indictments. He was arraigned on the charges presented in the first indictment on February 27, 2004, and was arraigned on the charges presented in the second indictment on March 29, 2004. The cases were consolidated on April 30, 2004. As noted above, Rule 8.2(a)(3)(iii) provides that a complex case filed in 2004 shall be tried within one year from arraignment. The trial court selected the February arraignment as the date from which to calculate the one-year trial deadline, and set the last day to begin trial as February 27, 2005.

¶ 14 As that deadline approached, the trial court noted that it would be presiding over an older capital murder case at that time. The court noted that because of the "many, many motions" it had considered in this case, the unique facts of the case and the fact that it had presided over proceedings involving Coy, it would be in the best position to preside over Defendant's trial. When the trial court raised with the presiding criminal judge the subject of the two conflicting trial dates, the presiding judge also agreed that because of the number of motions the trial court had considered and the unique facts of the case, it would not be proper to transfer Defendant's case to another court for trial.

¶ 15 Under these circumstances, the trial court found its unavailability to be an extraordinary circumstance and that a continuance was indispensable to the interests of justice, thus warranting a continuance pursuant to Rule 8.5(b). The trial court continued Defendant's trial to begin two days after the capital murder case ended. While Defendant objected to the continuance, he arguably acquiesced to the continuance when he then told the trial court, "I would rather you be the court—the judge in this case[.]" Trial ultimately began on March 9, 2005.

### 1. Commencement of time periods under Rule 8.

¶ 16 We first address Rule 8 of the Arizona Rules of Criminal Procedure. A trial court's ruling regarding Rule 8 will be upheld unless a defendant shows both an abuse of discretion and prejudice. *State v. Spreitz,* 190 Ariz. 129, 136, 945 P.2d 1260, 1267 (1997). Whether a trial court abused its discretion and prejudice resulted depends upon the facts of each case. *See id.* Further, in order to establish prejudice, a defendant must establish that his defense was harmed by the delay. *State v. Vasko,* 193 Ariz. 142, 147, ¶ 22, 971 P.2d 189, 194 (App. 1998). A defendant who fails to establish that his defense was prejudiced or that he was deprived of a fair trial has not established prejudice sufficient to warrant reversal of his conviction. *Id.* at 149, ¶ 31, 971 P.2d at 196.

¶ 17 Defendant argues the failure to begin his trial by February 27, 2005 violated the speedy trial provisions of Rule 8. There was no violation of Rule 8. The trial court should have calculated the last day for trial to commence based on the date of the second arraignment, which occurred on March 29, 2004. "When two or more cases are consolidated for trial, the time limits for Ariz. R.Crim. P. 8 are calculated from the case that has the longest period available." *State v. Hankins,* 141 Ariz. 217, 222, 686 P.2d 740, 745 (1984). Because the case that arose from the second indictment had the longer period within which to try the case, the last day should have been calculated based on the second arraignment date of March 29, 2004. Therefore, the last day to begin Defendant's trial was March 29, 2005. Defendant's trial began March 9, 2005. There was no Rule 8 violation.

### 2. Constitutional right to a speedy trial.

¶ 18 Defendant briefly argues that he was denied his right to a speedy trial under both the United States and Arizona Constitutions. "Neither the United States nor the Arizona Constitution requires that a trial be held within a specified time period." *Spreitz,* 190 Ariz. at 139, 945 P.2d at 1270 (citing the Sixth Amendment of the United States Constitution and Article 2, Section 24, of the Arizona Constitution). In fact, the right to a speedy trial afforded by Rule 8 is more strict than that provided by the United States Constitution. *Id.* at 136, 945 P.2d at 1267. Regardless, whether a delay in the start of trial violates constitutional speedy trial provisions is determined by four factors:

1. The length of the delay;

2. The reason for the delay;

3. Whether there was a demand for a speedy trial; and

4. Whether the defendant suffered any prejudice.

*Id.* at 139, 945 P.2d at 1270. Of these factors, the length of the delay is the least important, while any prejudice suffered by the defendant is the most important. *Id.* at 139–40, 945 P.2d at 1270–71.

¶ 19 There is no dispute that Defendant repeatedly asserted his right to a speedy trial. As for the length and reason for any delay, we have already determined that there was no delay under Arizona rules. This was a complex case that was tried within one year of arraignment as required by Rule 8. For the trial of such a case to begin within one year of arraignment was not an unreasonable delay under the Arizona or United States Constitutions. Further, the trial court reasonably determined that its unavailability and the unique circumstances of the case presented extraordinary circumstances and that the continuance it granted was indispensable to the interests of justice.

¶ 20 Even if we assume *arguendo* that his trial was improperly delayed, Defendant has not shown prejudice under Rule 8 or under the United States or Arizona Constitutions or that he was denied a fair trial. *See Vasko*, 193 Ariz. at 149, ¶ 31, 971 P.2d at 196. Whenever Defendant asserted his Rule 8 rights in the trial court, the only prejudice he asserted was that he was under "undue anxiety and stress," that he was "distract[ed]" and affected emotionally, or that jail personnel were "mess[ing] with" him by disconnecting his telephone. We acknowledge that anxiety and stress can be factors in determining whether a defendant was prejudiced by a trial delay. *See Doggett v. United States*, 505 U.S. 647, 654, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992); *Smith v. Hooey*, 393 U.S. 374, 377–78, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969). However, Defendant never argued that the delay caused him to be subject to prolonged confinement, that he was unable to fully investigate his case, that he could not adequately prepare for trial, that he was unable to locate evidence or witnesses, that he lost the opportunity to present any evidence or testimony or that he otherwise could not present his entire defense as intended. Accordingly, we find no violation of Defendant's right to a speedy trial.

## III. RIGHT TO COUNSEL

### A. Waiver of Counsel.

¶ 21 Defendant asserts that his waiver of counsel was not knowing and intelligent because the trial court failed to warn him that he would have to testify by responding to questions asked by his advisory counsel, rather than through narrative testimony or by asking himself questions. "[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).

¶ 22 We find Defendant made a knowing and intelligent waiver of his right to counsel. First, he repeatedly waived his right to counsel during the superior court proceedings, then reasserted his right to counsel and sought to change advisory counsel. Each time Defendant waived counsel, and even after Defendant simply reaffirmed his wish to represent himself, the trial court conducted the appropriate colloquy and informed Defendant of the rights and privileges he would relinquish and the disadvantages of self-representation. Nothing more was required.

¶ 23 Further, a defendant has no right to testify through any manner of his choosing. The trial court need not have informed Defendant that he would not be allowed to testify through his preferred method of narrative or by posing questions to himself. While a trial court must warn a defendant who seeks to represent himself of the dangers and disadvantages of self-representation, "it is not reversible error to fail to warn of every possible strategic consideration." *State v. Cornell*, 179 Ariz. 314, 324, 878 P.2d 1352, 1362 (1994).

¶ 24 Finally, the trial court informed Defendant on March 28, 2005 that he would have to testify through questions asked by advisory counsel. Defendant did not begin his testimony until one month later. Defendant had every opportunity to reassert his right to counsel before he testified, but chose not to do so.

¶ 25 We find Defendant made a knowing and intelligent waiver of his right to counsel.

## B. Right to Self–Representation.

¶ 26 Defendant's advisory counsel conducted his direct examination by asking him questions based on a written list of "topics" that Defendant had prepared and that he and his advisory counsel referred to during the examination. Defendant argues that requiring him to testify by responding to questions asked by his advisory counsel violated his right to self-representation. He argues that requiring advisory counsel to examine Defendant made it appear to the jury that Defendant was not in control of his own defense and that advisory counsel was actually representing Defendant. He also argues that his advisory counsel skipped questions, failed to offer a document in evidence and failed to present all the "topics" Defendant wanted to address in his direct examination.

¶ 27 A defendant who represents himself with the assistance of advisory counsel "must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." *McKaskle v. Wiggins*, 465 U.S. 168, 174, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). However, there is no absolute bar to advisory counsel's participation at trial over the objection of a defendant who is self-represented. *Id.* at 176, 104 S.Ct. 944. "[T]he primary focus must be on whether the defendant had a fair chance to present his case in his own way." *Id.* at 177, 104 S.Ct. 944. A defendant's right to self-representation is not infringed simply because advisory counsel assists with a defendant's compliance with routine procedure, protocol or evidentiary matters. *Id.* at 183, 104 S.Ct. 944.

¶ 28 Further, a defendant's right to proceed without counsel must be balanced against the need that trial be "conducted in a judicious, orderly fashion[.]" *State v. De Nistor*, 143 Ariz. 407, 412, 694 P.2d 237, 242 (1985) (quoting *United States v. Dujanovic*, 486 F.2d 182, 186 (9th Cir.1973)). The trial court has "broad discretion" regarding its management of the manner in which trial will be conducted, and has a duty to exercise that discretion. *Cornell*, 179 Ariz. at 332, 878 P.2d at 1370.

¶ 29 We find no violation of Defendant's right to self-representation in the requirement that he testify through questions asked by counsel. Arizona Evidence Rule 611(a) provides in relevant part that a trial court must exercise reasonable control over the mode in which witnesses testify so as to "make the interrogation and presentation effective for the ascertainment of the truth [and to] avoid needless consumption of time[.]" The trial court held that Defendant must present his evidence within the confines of the rules of evidence and that Defendant would testify in the same manner as every other witness who appeared at trial. The court noted that it had a responsibility to make sure the jury was presented with admissible evidence and that the only way to do this during Defendant's direct examination was to use a question-and-answer method. This would allow the jurors and the State to know each question before any answer or information was elicited, and to allow the jurors and State to anticipate the scope of the answer. As noted above, the trial court informed Defendant that he would be required to use this method a month before he testified. The court informed Defendant that he was in complete control of what questions advisory counsel would ask and even gave Defendant several ideas on how this could be accomplished. The trial court could reasonably determine that the best method to comply with the requirements of Rule 611(a) and provide for the orderly admission of Defendant's testimony was to have advisory counsel ask Defendant questions.

¶ 30 We reject Defendant's contention that testifying in this fashion made it appear that advisory counsel was representing him and that Defendant was not in control of his own defense. At Defendant's request, the trial court instructed the jury, "Mr. Wassenaar is the next witness. On my order, I order that his testimony be done by way of question and answer. So Mr. Curry is going to be asking the questions of Mr. Wassenaar." The court also informed the jury that Defendant, rather

than advisory counsel, would make any objections. Defendant raised numerous objections during his cross-examination, many of which were sustained. Therefore, the jury understood that Defendant still represented himself. Further, by the time of Defendant's examination, the jury had observed him make his own opening statement, examine witnesses, introduce evidence and raise many objections (a large number of which were sustained) for more than a month. It was clear that Defendant was representing himself and that he was in control of his own case during his testimony. This was reinforced by the fact that the day after the completion of Defendant's testimony, the jury observed Defendant make his own closing argument.

¶ 31 Regarding Defendant's claim that advisory counsel failed to introduce certain evidence, as a *pro per* defendant, it was Defendant's task, not that of advisory counsel, to ensure that all evidence Defendant sought to introduce was introduced. Defendant complains that a letter from his mother's doctor was not admitted, but that letter is not in the record before us. Defendant does not identify what questions advisory counsel did not ask, what document he failed to introduce or what topics he failed to address.

¶ 32 Defendant argues only that counsel "forgot" to ask Defendant questions about his mother's health. The record reflects otherwise. Defendant argued at trial that he was not trying to escape when he assaulted and kidnapped the officers. Instead, he contended, he took the tower and held the two corrections officers hostage to gain leverage for his request for a transfer to another prison closer to his mother's home in Michigan. The jury heard ample testimony regarding the health of Defendant's mother, all of it introduced through Defendant's testimony in response to questions asked by advisory counsel. Defendant testified that he wanted to be transferred to a prison closer to his mother because she was ill, that she could not travel due to her age and her health, that he would never see her again unless he were transferred, that he needed to see her again before she passed away and would use any means necessary to do so, and that DOC did not care that he would never see his mother again.

¶ 33 We find that Defendant's right to self-representation was not violated by requiring that he testify through questions posed by advisory counsel.

## IV. PRECLUSION OF EVIDENCE

### A. Evidence that Defendant Had Not Previously Assaulted a Corrections Officer.

¶ 34 Defendant asserts that the trial court erred when it precluded evidence that Defendant had never previously assaulted a corrections officer. Defendant was asked, "In the course of your 17 plus years in prison, have you ever been written up for assaulting staff?" Defendant answered, "No, I have not." The trial court sustained the State's relevance objection and struck Defendant's answer. Defendant argues he should have been allowed to introduce this evidence.

¶ 35 We need not address whether the trial court erred when it sustained the objection. Earlier in the trial, testimony was introduced through a DOC official that Defendant had no disciplinary actions for assaulting DOC personnel prior to the standoff. Therefore, the jury already knew that Defendant had never before been "written up" for assaulting staff.

### B. Evidence Regarding Why Defendant Smuggled a Handcuff Key Into a Federal Prison Facility.

¶ 36 During the standoff, negotiators provided Defendant a handcuff key, which he did not return. After Defendant surrendered, he was taken to a federal prison facility. When Defendant attempted to smuggle the key into the federal facility, it was discovered hidden under his foot. Defendant admitted that he smuggled the key into the facility, but he claimed that he did not intend to use the key to escape. Instead, he testified that he kept the key only in case that, as he expected, DOC personnel beat him after he was returned to State custody. Defendant testified that he planned that if he were being beaten, he intended to use the key to

escape from his handcuffs and defend himself.

¶ 37 When Defendant sought to testify about prior experiences with DOC that caused him to believe he would be beaten once taken back into custody, the State objected based on relevance, and the trial court sustained the objection. The court held that while Defendant's state of mind was relevant, the basis for that state of mind was not. Defendant asserts that the trial court erred when it precluded evidence of his past experiences with DOC to explain why he feared he would be beaten.

¶ 38 The trial court maintains discretion "in determining the relevance and admissibility of evidence," and we therefore review its evidentiary rulings for an abuse of discretion. *State v. Amaya–Ruiz*, 166 Ariz. 152, 167, 800 P.2d 1260, 1275 (1990). Here, we find no abuse of discretion. Defendant testified that he smuggled the handcuff key into the federal facility because he was afraid of DOC, because he feared and expected that he would be taken into DOC custody and be beaten, assaulted and "have my ass kicked severely," and that he would need the key to be able to escape his handcuffs and defend himself during these beatings. Further, during the discussion of this issue, Defendant conceded to the trial court that "throughout this trial, the State has played tape recordings stating that I was in fear of what the Department of Corrections would do to me after I surrendered."

¶ 39 The jury was well informed of Defendant's contention that he smuggled the handcuff key into the federal facility not to escape but to defend himself from a beating he feared was imminent. The trial court did not abuse its discretion when it excluded evidence of why Defendant allegedly harbored this belief.

## V. THE DECISION TO SECURE DEFENDANT TO THE WITNESS CHAIR

¶ 40 During most of the trial, Defendant wore surreptitious restraints and was required to remain at the counsel table. When time came for Defendant to testify, court security requested that Defendant be secured to the witness chair. The trial court agreed with the recommendation and ordered that it be done "as surreptitiously as possible." During his testimony, Defendant was secured to the chair by nylon "flex cuffs" around his ankles. Defendant contends that the trial court erred when it ordered that he be secured to the chair and that he was denied a fair trial when jurors saw the restraints.

¶ 41 "Whether a defendant will be shackled is within the sound discretion of the trial court." *State v. Lee*, 189 Ariz. 608, 617, 944 P.2d 1222, 1231 (1997) (quoting *State v. Bracy*, 145 Ariz. 520, 532, 703 P.2d 464, 476 (1985)). "Courtroom security is within the discretion of the trial court 'absent incontrovertible evidence' of harm to the defendant." *Id.* (quoting *State v. McKinney*, 185 Ariz. 567, 576, 917 P.2d 1214, 1223 (1996)). However, the determination of whether to shackle a defendant must be case-specific, and should reflect particular concerns related to the defendant, including special security needs or the risk of escape. *State v. Gomez*, 211 Ariz. 494, 503, ¶ 40, 123 P.3d 1131, 1140 (2005).

¶ 42 We conclude the court did not abuse its discretion when it ordered that Defendant be surreptitiously secured to the witness chair. In doing so, the trial court explained:

> The Court finds the deputies' request was valid for the defendant, because Mr. Wassenaar had made statements in court to the effect that he would try to escape again and statements that he sometimes loses control when things don't go his way, as well as the charges themselves, which raised a concern for safety, and for escape.

The trial court's ruling is amply supported by the record. During a hearing regarding the use of Defendant's prior felony convictions for impeachment, Defendant told the trial court, "I can be a violent man when provoked, Your Honor." During his opening statement, Defendant stated, "[G]iven the same circumstances today as that, I would take that tower again today," and "I do not regret taking that tower." The record indicates that at trial, just as he did during the

standoff, Defendant did not respond well when he did not get his way. At one point during the direct examination of the corrections officer whom Defendant overpowered in the kitchen, Defendant blurted out, "That's enough, man." The start of trial one day was delayed after Defendant became angry and intentionally ripped the shirt he had been given to wear because he did not like it. While there is no reference to it in the transcript, a minute entry makes reference to another "outburst" by Defendant in court during trial. When Defendant argued it was not necessary to restrain him to the chair, he stated in part, "I understand [the prosecutor is a] good [cross-examiner], but she's not good enough to make me come out of that chair, Judge." That statement carries the inference, and perhaps an acknowledgment, that under certain circumstances, Defendant indeed would "come out of that chair."

¶ 43 Finally, by the time Defendant testified, the trial court had denied Defendant's motion for judgment of acquittal on charges of first-degree escape and multiple counts of dangerous or deadly assault by a prisoner. Defendant therefore knew at that point that he faced numerous consecutive life sentences if he were convicted on the charges. The court also noted that by the time Defendant testified, it was well known to the jury that Defendant was in custody and had been for some time. Under these circumstances, the trial court did not abuse its discretion when it ordered that Defendant be surreptitiously secured to the witness chair.

¶ 44 Regarding whether the restraints could be seen by the jury, the court noted that the jury "definitely cannot see [any restraints] from the jury box." To see for himself, the judge sat in the juror chairs closest to the witness stand and noted that the flex cuffs could not be seen, and that "it is not at all observable that [Defendant] is restrained." Defendant's advisory counsel agreed with the court's observations. While Defendant contends that several jurors did see the restraints at some unspecified time, he provided no admissible evidence to support his contention. As part of a motion to vacate, Defendant provided a letter from an investigator who claimed to have been told by three jurors that they saw the restraints

during Defendant's testimony. The motion was not supported by any affidavit from the investigator nor any of the jurors. Unsworn statements of third parties regarding unsworn statements of jurors are not competent evidence to prove what those jurors did or did not see. *See State v. McMurtrey*, 136 Ariz. 93, 98, 664 P.2d 637, 642 (1983). Therefore, there was no competent evidence that any juror saw Defendant's restraints. *Id.*

¶ 45 Even if we assume *arguendo* that one or more jurors did see the restraints, the record reflects that it was likely because Defendant intentionally drew attention to the restraints. As the jurors exited the courtroom during a break in Defendant's testimony one day, the State asked the trial court to note that Defendant called attention to himself and his restraints. The court stated, "The record will reflect that—I don't know if the reporter was stand [sic] for the jurors, Mr. Wassenaar was making small jokes as the jurors were leaving." The minute entry from that day indicates that the court took judicial notice that Defendant drew attention to himself and his restraints by speaking to the jurors from the witness chair as they entered and exited the courtroom.

¶ 46 Finally, if any juror saw the restraints, it is apparent their observation did not affect the verdicts. As noted above, Defendant was not convicted of all counts. Further, the jury found that the State failed to prove some of the aggravating factors submitted for sentencing purposes.

¶ 47 We find the trial court did not abuse its discretion when it ordered that Defendant be surreptitiously secured to the witness chair, nor was Defendant otherwise denied a fair trial.

¶ 48 Defendant also asserts that the trial court erred when it failed to hold an evidentiary hearing regarding whether any jurors saw that he was secured to the witness chair. Defendant requested such a hearing in two separate motions to vacate. We review the decision whether to hold an evidentiary hearing for abuse of discretion. *See State v. Spears*, 184 Ariz. 277, 289, 908 P.2d 1062, 1074 (1996).

¶ 49 While the trial court found both motions untimely, the court also addressed the merits. The court held that Defendant's restraints could not be seen from the jury box and that while there was a "fleeting opportunity" for the jurors to see the restraints as they walked from the jury room to the jury box, there was no admissible evidence any juror did so. The court also noted that the jury was well aware that Defendant was in custody, and that the record reflected the jurors were not biased against Defendant even if they did observe the restraints because they acquitted him of attempted second-degree murder and found the State failed to prove some of the aggravating factors.

¶ 50 We find no abuse of discretion. We need not address whether the motions to vacate were timely because, like the trial court, we have addressed the merits. We may affirm on any basis supported by the record. *State v. Robinson*, 153 Ariz. 191, 199, 735 P.2d 801, 809 (1987). We have already determined that there was no competent evidence that any juror saw that Defendant was secured to the chair. *McMurtrey*, 136 Ariz. at 98, 664 P.2d at 642. Further, as noted above, the record indicates that if any jurors saw Defendant's restraints as they entered or exited the court room, it was because Defendant intentionally drew the jury's attention to them.

¶ 51 We find no abuse of discretion in the failure to hold an evidentiary hearing.

## VI. CONCLUSION

¶ 52 Because we find no error, we affirm Defendant's convictions.

CONCURRING: LAWRENCE F. WINTHROP and PHILIP HALL, Judges.